IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOMUS, INC. | : | CIVIL ACTION |
| | : | NO. 10-1654 |
| v. | : | |
| | : | |
| DAVIS-GIOVINAZZO CONSTRUCTION | : | |
| CO., INC., et al. | : | |

O'NEILL, J.                                                August 22, 2011

## MEMORANDUM

Who is entitled to $768,674.00 – an amount determined by a panel of arbitrators to be the receivables due to defendant Davis Giovinazzo Construction Co., Inc. from plaintiff Domus, Inc. and deposited by Domus with this Court on June 1, 2010?  Domus filed this interpleader action to answer that question.  Domus also seeks confirmation of the arbitration award and a declaratory judgment declaring that, by its release of the interpled fund, it has discharged all liability for monies owed to DGC.  Following dismissal of certain defendants from the action for either having disclaimed their interest in the interpled fund or having failed to state an interest in the interpled fund, I held a bench trial to resolve the competing claims of the remaining defendants.  The remaining defendants are DGC, Ira Davis, Bruce Patterson, Edward J. Morris, P.C., Susquehanna Bank, the City of Philadelphia, Philadelphia Laborers' District Council Benefit Funds (incorrectly designated as Laborers' International Union Local #332)[1], and

---

[1]        The Laborer's District Council Benefit Funds have not established a right to any part of the interpled fund as they never set forth the basis for or the amount of their purported claim to the interpled fund.  Instead, the Benefit Funds argued that they do not know if they are owed outstanding benefit contributions from DGC and stated that they are "obligated to participate in these proceedings to obtain certified payroll documents to determine the amount, if any, benefit contributions owed and collect any sums due."  Curiously, the Benefit Funds did not assert that they tried to obtain this information through the discovery process.

intervenor defendant Great American Insurance Company.

Pursuant to Federal Rule of Civil Procedure 52(a) and after review of the evidence presented and the applicable law, I make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The claims now before me arise out of certain debts of DGC.  Although no articles of dissolution have been filed to dissolve the company, Trans. 162:16-163:1, DGC is no longer actively in business.  Id. 116:9, 116:21-24.

I.    **Domus, DGC and the Arbitration Award**

Domus, a prime contractor, hired DGC as a masonry subcontractor to work on a number of projects including the Roberts Vaux Middle School project, the Martin Luther King Plaza project and the Schuylkill Falls Housing Development project.  Id. 19:22-24; SB Exs. 16, 17, 18. Domus' contracts for the Vaux, Schuylkill Falls and Martin Luther King projects were contingent on minority contractor participation and it hired DGC as a certified minority contractor for each project.  Trans. 49:16-50:8, 89:17-23.

As the Vaux project drew to a close, Domus became aware of problems with the management of DGC.  Id. 21:22-22:8, 24:24, 25:8.  Entities began contacting Domus regarding money that DGC owed to them and Domus was joined as a garnishee in certain lawsuits against DGC.  Id. 22:12-15, 25:2-10; Domus Exs. 3, 4.  Given growing uncertainty regarding DGC's status and at the request of Patterson, DGC's Secretary, Domus began to deposit the money it owed to DGC into an escrow account rather than make direct payments to DGC.  Trans. 22:16-22.

Seeking to collect the money Domus owed to DGC, on June 5, 2008, DGC, represented

by Peter J. Norman of Klehr Harrison Harvey Branzburg & Ellers LLP,[2] filed a demand for AAA

arbitration pursuant to the arbitration provision in the subcontract for the Vaux project.  SB Ex.

11.  The demand stated the following:

> NATURE OF THE DISPUTE
>
> Claimant [DGC] is a subcontractor on the Robert Vaux School
> Project (the "Project") and brings this action against the
> Respondent Domus, Inc., the prime contractor on the Project.
> Domus has breached its contract with DGC and has failed to
> promptly pay DGC for work performed by DGC on the Project.
> DGC makes a claim for breach of contract and violation of the PA,
> [sic] Contractor & Subcontractor Payment Act.  DGC is owed
> $899,525 under the Contract, as well as $175,000 for authorized
> extra work.

Id.

The arbitration demand made no reference to the Martin Luther King or Schuylkill Falls

projects.  SB Ex. 11.  However, James Wyatt, a principal at Domus, testified that as a part of the

arbitration process he "prepared [an] accounting of monies that were due on the Roberts Vaux

School and change orders and listed the Schuylkill Falls and Martin Luther King separately at the

bottom of the page," Trans. 79:3-10, and that at the arbitration he submitted evidence of the

amounts due on all three projects.  Id. 36:5-7; see also Domus Ex. 9.  Charles Hillis, a founder of

Domus, testified that he understood that the arbitration proceeding would resolve all of the

claims against Domus for DGC's receivables.  Trans. 86:15-87:16.

On April 5, 2010, a panel of arbitrators found that "[t]he amount due [DGC] under its

subcontract with Domus is $738,045.00" and they awarded DGC $19,129.00 in interest.  Domus

Ex. 11; SB Ex. 15.  Accordingly, the panel issued the following award: "Domus shall pay to

---

[2]      Klehr Harrison represents Susquehanna in this proceeding.

[DGC] the net sum of Seven Hundred Fifty Seven Thousand One Hundred Seventy Four Dollars and No Cents ($757,174.000).  Domus was also ordered to reimburse DGC $11,500 of the arbitrators' administrative fees, for a total amount of $768,674.00.  Id.

No appeals were taken from the arbitration award.  Trans. 7:14-16, 12:21-25.  Instead, on April 14, 2010, alleging that multiple parties had claimed priority to the monies owed to DGC under the arbitration award, Domus filed this action seeking confirmation of the arbitration award, asserting a claim for statutory interpleader pursuant to 28 U.S.C. § 1335 and requesting a declaratory judgment limiting its liability to any creditors of DGC.  On June 1, 2010, Domus deposited $768,674.00 into the registry of this Court.

## II.    Status of Minority Control of DGC

DGC operated as a certified Minority-Owned Business Enterprise necessitating that control of the company be vested in a minority.  Trans. 24:22-25, 130:16-131:1.  Davis, a minority, served as president and CEO of DGC and held 55 percent of its common stock.  Id. 127:11-19.  Frank Giovinazzo, who is not a minority, was a 45 percent owner.  Id. 127:20-23. Patterson, as Secretary of DGC, assumed the role of making decisions as the minority in control of DGC between 2001 and 2007, when Davis, suffering from cancer, gave Patterson a power of attorney to control his share of the stock.  Id. 131:2-10.  At the same time, John Giovinazzo, Frank Giovinazzo's son, bore the power of attorney for his father's forty-five percent interest.  Id. 131:11-15.

In April of 2007, the City of Philadelphia recertified DGC as a Minority-Owned Business Enterprise, citing reciprocity from DGC's "certification from the New Jersey Commerce & Economic Growth Commission Office of Development for Small Business & Women &

4

Minority Businesses."  Morris D2 at 1.  The recertification letter noted that in the event of "a

material change to the ownership and control" of DGC, it should "promptly notify this office, in

writing, for a review of the changed circumstances."  Id. at 2.

Patterson testified that in late 2007, his paychecks and benefits stopped and he ultimately

ceased participating in the day to day operations of DGC.  Trans. 138:18-140:11.  After

Patterson's departure, John Giovinazzo remained at Domus and ran the company's day to day

operations.  Id. 113:22-24, 114:19-21, 141:17-23.  Although he was no longer being paid,

Patterson testified that he continued to return to the office to "check on things and to see how

things were going" and that although no minorities continued to participate in the day-to-day

operations of DGC, he saw that his "rubber stamp was still there and [his] name was still being

signed on things and notices were being served."  Id. 140:2-24.

After Patterson's departure from DGC, Domus was not made aware of any changes to the

control or ownership of DGC that might have affected DGC's ability to meet the minority

business enterprise certification requirements.  Id. 51:23-52:2.  There was no testimony as to

whether or not the office of Minority Owned Business Enterprises was ever made aware of a

Patterson's departure from DGC.

## III.    Susquehanna's Loans to DGC

On May 16, 2006, Susquehanna[3] entered into a loan transaction with DGC, dismissed-

---

[3]    At the bench trial, Jane Homan, a loan workout manager for Susquehanna Bank,
Trans. 95:6-7, testified that Susquehanna Bank is the successor to Susquehanna Patriot Bank.  Id.
122:12-16.  Great American, DGC, Davis, Patterson and Morris now argue that Susquehanna
Bank cannot prove an entitlement to the interpled fund because Homan's testimony is not
competent evidence of Susquehanna Bank's succession to the rights of Susquehanna Patriot
Bank.  Susquehanna Bank counters that I may take judicial notice of the Articles of Conversion
and Articles of Merger filed with the Pennsylvania Department of State and of the fact that

defendants General Masonry and Davis Giovinazzo Masonry, Co., Inc. and non-party Tri-State

Masonry (collectively, the DG Obligors).  Susquehanna agreed to lend the DG Obligors

$2,250,000, SB Ex. 2, and to extend them a line of credit of up to $6,000,000.  SB Ex. 3.  The

agreements were subsequently amended by increasing the loan and line of credit amounts.  SB

Ex. 5.

       Both the loan and line of credit agreements are secured by, among other things, a security

agreement, SB Ex. 1, and a UCC-1 financing statement.  SB Ex. 4.  The security agreement was

signed by Patterson as Secretary of DGC on May 16, 2006.  SB Ex. 1.  Susquehanna filed a

UCC-1 financing statement with the Commonwealth on May 22, 2006 indicating that DGC had

"granted a first lien interest to" Susquehanna.  SB Ex. 4 at 1.  The security agreement and UCC-1

financing statement cover, inter alia, "[a]ll tangible and intangible personal property of [DGC],

including but not limited to: (a) all of [DGC's] present and future accounts . . . ."  SB Ex. 1 at 2;

SB Ex. 4 at 2.

       Under Section 4.1 of the Security Agreement, the DG Obligors agreed that:

           Upon the occurrence of an Event of Default . . . the authority

---

Susquehanna Bank is the successor in interest to Susquehanna Patriot Bank.  I agree with
Susquehanna.  See Leisher v. Wachovia Mortg., Inc., No. 10-2294, 2011 WL 98575, at *3 (S.D.
Cal. Jan. 12, 2011) (taking judicial notice of official records showing that bank changed its name
and became the successor by merger to another bank); DeLeon v. Wells Fargo Bank, N.A., No.
10-01390, 2011 WL 311376, at *2-3 (N.D. Cal. Jan. 28, 2011) (taking judicial notice of
documents evidencing bank merger).  A fact properly subject to judicial notice is one "not
subject to reasonable dispute in that it is either (1) generally known within the territorial
jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to
sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201 (2009).  "A court
may take judicial notice of a public record . . . ."  Weaver v. Conrail, Inc., No. 09-5592, 2010 WL
2773382, at *10 (E.D. Pa. July 13, 2010).  I will deny Great American's motion to strike
post-trial evidence.  Further, I will refer to both Susquehanna Bank and Susquehanna Patriot
Bank as Susquehanna.

> hereby given to the [DG Obligors] to collect the Proceeds of
> Accounts in trust for [Susquehanna] may be terminated by
> [Susquehanna] at any time and [Susquehanna] shall have the right
> at any time thereafter, <u>acting if it so chooses in the [DG Obligors']</u>
> <u>name</u>, to collect Accounts itself, to sell, assign, compromise,
> discharge or extend the time for payment of any Account, <u>and to do</u>
> <u>all acts and things necessary or incidental thereto</u> and the [DG
> Obligors] hereby ratif[y] all such acts.

SB Ex. 1 at 6 (emphasis added).

Around August 2007, DGC went into default on the loans.  Trans. 101: 17-21.

Susquehanna entered into a Forbearance Agreement with the DG Obligors on or about

September 25, 2007.[4]  SB Ex. 6.  As acknowledged in the Forbearance Agreement, the DG

Obligors were

> in default of their obligations under the Loan Documents by virtue
> of, among other things, the failure to comply with various other
> covenants, overdrafts of the Line of Credit and others such that
> Susquehanna had and continues to have the right to exercise all
> rights and remedies it possesses against [DG Obligors] under the
> Loan Documents.

<u>Id.</u> at 1-2.  In executing the Forbearance Agreement, DGC, Patterson and Davis reaffirmed that

the DG Obligors had "granted Susquehanna a first lien security interest in all of the assets of the

[DG Obligors] including, but not limited to, [DGC's] presently owned and after acquired

accounts."  <u>Id.</u> at 1.

After executing the Forbearance Agreement, the DG Obligors defaulted again by

generating overdrafts and making intermittent payments on their outstanding loan balance.

Trans. 101:15-103:16.  Section 9 of the Forbearance Agreement provided that it would

---

[4]     The Forbearance Agreement is executed but the only date it bears is a 9-25-2007
date stamp in the document header.  SB Ex. 6.

automatically terminate upon the occurrence of an Event of Default, and that "Susquehanna may,

without any further notice seek to immediately exercise any and all rights and remedies it

possesses, including without limitation . . . any and all rights and or remedies it possesses with

respect to any Collateral described in the Loan Documents."  SB Ex. 6 at 5.

On June 16, 2008, Susquehanna filed a complaint in confession of judgment in the

amount of $17,079,732.52 against DGC and others in the Montgomery County Court of

Common Pleas (Docket No. 2008-16538).  SB Ex. 7.  The judgment has been subsequently

amended downward to reflect certain collections recovered through the liquidation of some of

DGC's assets.  SB Exs. 8, 9.

**IV.     Susquehanna's Involvement with DGC following DGC's Default**

At the bench trial, there was conflicting testimony as to how much control Susquehanna

exercised over DGC's business and management operations after DGC defaulted on the

Forbearance Agreement.  At some point during the latter half of 2007, a consultant named Kevin

Rife went to DGC to try to assess the company's financial situation, to help collect receivables

and to help administer the closing out of DGC's finances.  Trans. 135:10-136:7, 147:6-148:1.

Patterson testified that he was "pretty sure that the arrangement [with Rife] was made by the

bank for their interest because they wanted . . . an independent person to actually a[ss]ess the –

the real condition of the financial condition of the company."  Id. 136:13-11.  In contrast, Homon

testified that Rife was engaged by DGC although she could not recall whether he was ever

engaged by Susquehanna.  Id. 124:24-125:6.  Patterson testified that "Rife, by way of

Susquehanna Bank" stopped his paycheck, Id. 139:16-1, and that John Giovinazzo continued to

receive a salary "from [DGC] authorized by Kevin Rife."  Id. 141: 5-10.  When asked if he

believed that John Giovinazzo "was employed and paid by Susquehanna Bank," Patterson responded, "[b]y authorization of Susquehanna Bank." Id. 141:24-142:1. Rife did not testify at the bench trial and the parties did not introduce any documents to establish Rife's relationship with either DGC or Susquehanna. Homon testified that Susquehanna never took over the day-to-day operations of the management and control of DGC, never took over the books, records and documents of DGC and that DGC never operated out of Susquehanna's offices. Id. 113:2-7, 118:17-21, 119:2-4, 119:6-9.

The parties also disagree about whether DGC authorized Klehr Harrison to bring the arbitration proceeding against Domus on DGC's behalf. Both Patterson and John Giovinazzo participated in the arbitration proceedings, each purporting to represent the interests of DGC. Id. 142:15-23. At the arbitration hearing, Domus contended that the arbitration proceeding "was the action of Susquehanna Bank and not DG[C]." SB Ex. 13 at 1. The post hearing briefs Domus and DGC submitted to the arbitration panel each addressed the issue of whether the arbitration claim was appropriately authorized by and brought on behalf of DGC. SB. Exs. 13, 14. According to Domus' post hearing brief, the arbitration panel ruled that the authorization to bring the arbitration claim "was a factual issue to be proven at the arbitration." SB Ex. 13. However, in entering the award in favor of DGC, the arbitration panel did not explicitly address its finding with respect to whether the claim had been appropriately authorized by DGC. Domus Ex. 11; SB Ex. 15.

## IV.   Relationship Between DGC and Great American

Great American asserts a claim to the fund arising out of its suretyship relationship with DGC in the amount of $327,241.43, exclusive of additional costs and attorney's fees. In

9

exchange for bonding credit, DGC and certain of its affiliates and corporate officers entered into agreements of indemnity for the benefit of Great American on December 30, 1991, and again on January 7, 1993.  Trans. 169:7-15; GA Exs. 1, 2, 3.  DGC, as an indemnitor, promised to

> exonerate, indemnify, and keep indemnified the Surety [Great American] from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety [Great American] may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds . . . .

GA Ex. 1, ¶ 2; GA Ex. 2, ¶ 2.

Thereafter, Great American, as surety, together with DGC, affiliates of DGC or joint ventures involving DGC as a principal, issued bonds for a number of DGC projects.  Trans. 175:14-21; GA Ex. 3.  Great American received, defended, resolved, sustained losses and incurred expenses resulting from certain bond claims.  Trans. 175:12-21; GA Ex. 4.  At trial, Great American put forth evidence of losses from bond claims including $8,114.58 for the Rutgers University Biomedical Building project, $1,964.00 for the Underwood Hospital project and $309,204.14 for the Heritage Village Shopping Plaza project.  Trans. 175:22-178:2; GA Ex. 4.  Great American also claimed $7,958.71 in attorney's fees and costs associated with this interpleader action.  GA Ex. 4.

Under the agreements of indemnity, DGC assigned to Great American "any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Debtor has an interest."  GA Ex. 1, ¶ 3; GA Ex. 2, ¶ 3.  The agreements of indemnity also provide Great American with a security interest in any such sums.  GA Ex. 1, ¶¶ 3, 5; GA Ex. 2, ¶¶ 3, 5.  On March 28, 2008,

10

Great American perfected its security interests by filing two UCC financing statements with the Pennsylvania Department of State.  Trans. 174:2-175:6; GA Ex. 5.  The financing statements identify Great American as the secured party and DGC as the debtor and the collateral is identified as including "all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Debtor has an interest."  GA Ex. 5.  Great American acknowledges that it filed its UCC filing statement after Susquehanna filed its UCC filing statement.

## V.      DGC's Obligations to The City of Philadelphia

The City of Philadelphia asserts that it is presently owed at least $1,257,744.81 as a result of DGC's failure to pay wage withholding taxes due to the City.[5]  The City concedes that it is not a secured creditor.

## VI.     DGC's Obligations to Edward Morris

On or about May 5, 2008, Morris entered a judgment against DGC for legal services performed in the Court of Common Pleas for Montgomery County, Pennsylvania.  The

---

[5]      Despite the City's asserted claim to the interpled fund due to DGC's tax obligations to it, the City did not present evidence of the alleged tax obligations in its pretrial brief or at the bench trial.  See, e.g., Trans. 181:19-24 ("THE COURT:  Ms. Brice . . . do you have any evidence?  MS. BRICE:  I do not, the City would rest.  THE COURT:  You're resting? MS. BRICE:  Yes.").  I find that the City has not met its burden to establish a claim to the interpled fund.  Cf. Syms v. McRitchie, 187 F.2d 915, 919 (5th Cir. 1951) (holding that an interpleader defendant "must recover, if at all, upon the strength of his own title, not upon the weakness of his adversary's"); Midland Ins. Co. v. Friedgood, 577 F. Supp. 1407, 1411 (S.D.N.Y. 1984) (citations omitted) ("each claimant must succeed in establishing his right to the property by a preponderance of the evidence").
Even if I were to find that the City had met its burden to establish a claim to the interpled fund, its claims to DGC's outstanding tax obligations would not be satisfied out of the fund.  The interests of Susquehanna and Great American in DGC's receivables are superior to the City's unsecured interest and there are not adequate monies in the interpled fund to satisfy all of their claims.

Montgomery County judgment was transferred and filed in the Court of Common Pleas for

Philadelphia County on June 9, 2008.  (Docket No. 080601321).  On June 10, 2008, Morris

entered judgment against Domus, Inc. as garnishee in the amount of $39,944.00 plus interest and

costs in the Court of Common Pleas for Philadelphia County and thereafter issued a Writ of

Execution upon Domus, Inc. as garnishee.  Domus Ex. 4.  On April 1, 2009, the Court of

Common Pleas for Philadelphia County entered an Order mandating that Morris retain

possession of funds he had received from Domus pursuant to his garnishment of Domus and

dissolved any garnishment against Domus.  SB Ex. 20.

Although the arbitration award does not include an explicit finding that the amounts due

from DGC to Morris had been satisfied prior to the arbitrators' determination, the award

specifically excluded $44,084.00 owed to Morris from the amount due to DGC under its

subcontract with Domus.  Domus Ex. 11; SB Ex. 15.[6]

## CONCLUSIONS OF LAW

### I.      Confirmation of Arbitration Award

Because neither Domus nor DGC took an appeal from the arbitration award, and because

the parties appearing at the bench trial represented that they do not oppose confirmation of the

arbitration award, Trans. 6:1-4, 8:24, 16:11-14, I will confirm the award of the arbitrators.[7]  A

---

[6]      Like the City, Morris has not met his burden to establish that he has a claim to the fund.

[7]      Pursuant to the subcontract between Domus and DGC for the Vaux project the arbitration was conducted "in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association [then] in effect."  SB Ex. 11 at p. 8, Art. 6.2.2.  The subcontract does not specify whether Pennsylvania law or the Federal Arbitration Act would apply to any arbitration conducted thereunder and the parties have not addressed whether I should apply the FAA or Pennsylvania law in determining whether to confirm the arbitration award.

judgment confirming an arbitral award "shall have the same force and effect, in all respects, as,

and be subject to all the provisions of law relating to, a judgment in an action."  9 U.S.C. § 13;

see also Dyer v. The Travelers, 572 A.2d 762, 764 (Pa. Super. Ct. 1990) ("An arbitration award

from which no appeal is taken has the effect of a final judgment on the merits.").

## II.      Disposition of Interpled Fund

Having confirmed the arbitrators' award of funds from Domus to DGC, I must determine

whether DGC is entitled to the interpled fund or whether, as a result of DGC's pre-existing

obligations to them, the other interpleader defendants have priority claims to the proceeds of the

arbitration award.  Interpleader provides an equitable remedy allowing "a person holding

property to join in a single suit two or more persons asserting claims to that property."  NYLife

Distrib., Inc. v. Adherence Group, Inc., 72 F.3d 371, 372 n.1 (3d Cir. 1995).  "The plaintiff in an

interpleader action is a stakeholder that admits it is liable to one of the claimants, but fears the

prospect of multiple liability.  Interpleader allows the stakeholder to file suit, deposit the property

with the court, and withdraw from the proceedings.  The competing claimants are left to litigate

---

Under Pennsylvania law, the Court must confirm an arbitration award unless a party
moves to vacate, modify or correct the award "within 30 days after delivery of a copy of the
award to the" party seeking to challenge the award.  42 Pa. Cons. Stat. Ann. § 7314(b); see also
42 Pa. Cons. Stat. Ann. § 7313; Snyder v. Cress, 791 A.2d 1198, 1201 (Pa. Super. Ct. 2002)
("Two features of common law arbitrations are that the award is binding and that any appeal
therefrom to the Court of Common Pleas must be made within 30 days of the award.").  Sections
9-11 of the FAA "authorize [a] district court to confirm, vacate, or modify [an arbitrator's] award
under a narrow scope of judicial review."  John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d
132 (3d Cir. 1998).  Section 12 of the FAA requires the party against whom an arbitration award
was entered to file a motion to vacate, modify or correct the award within 90 days of the award's
entry.  9 U.S.C. § 12.  Because neither Domus nor DGC took a timely appeal from the arbitration
award, Trans. 7:14-16, 12:21-25, I find it unnecessary to decide whether the FAA or
Pennsylvania law should be applied in reaching my determination that the arbitration award
should be confirmed.

between themselves." Metropolitan Life Ins. Co. v. Price, 501 F.3d 271, 275 (3d Cir. 2007)

(citation omitted).  "[T]he general purpose of an interpleader action is to decide the validity and

priority of existing claims to a res." Texaco, Inc. v. Ponsoldt, 118 F.3d 1367, 1369 (9th Cir.

1997); see also White v. F.D.I.C., 19 F.3d 249, 253 (5th Cir. 1994) ("when an action in

interpleader is brought, the court should, absent extraordinary circumstances, determine the

relative priorities of all claimants as of the time that the interpleader was initiated").  "[E]ach

claimant must succeed in establishing his right to the property by a preponderance of the

evidence." Midland Ins. Co. v. Friedgood, 577 F. Supp. 1407, 1411 (S.D.N.Y. 1984) (citations

omitted); see also Metropolitan Life Ins. Co. v. Jacques, 396 F. App'x 709, 710 (2d Cir. 2010)

(same); 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and

Procedure § 1714, at 629 & n.21 (3d ed. 2001) (same).  Susquehanna, Great American, the City

of Philadelphia, Morris, DGC, Davis and Patterson each claim a right to the interpled fund.  For

the reasons that follow, I conclude that Susquehanna is entitled to the entirety of the interpled

fund.

> **A.     Priority of Interests**

Because there are not adequate monies in the interpled fund to satisfy the claims of all of

the defendants, I must determine which of them has a priority interest in the interpled fund.

Under the Uniform Commercial Code as codified in Pennsylvania, a creditor with a perfected

security interest in collateral generally has an interest in the collateral that is superior to any

interests of unsecured creditors.  See United States Fidelity & Guarantee Co. v. United Penn

Bank, 524 A.2d 958, 960 (Pa. Super. Ct. 1987); 13 Pa. C. S. § 9201.  "Perfection requires

(1) attachment and (2) the filing of a financing statement with state and local government offices

indicating the debtor, the secured party, and the collateral attached."  Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d 230, 237 (M.D. Pa. 2004), citing 13 Pa. Cons. Stat. §§ 9308(a), 9310(a), 9502 (further citations omitted).  Where two or more creditors have perfected security interests in the same collateral, the party who filed his security interest first will generally have priority.  13 Pa. Cons. Stat. § 9322 ("Conflicting perfected security interests . . . rank according to priority in time of filing or perfection.  Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest . . . is first perfected.").

Susquehanna asserts that it holds a perfected UCC security interest in DGC's accounts receivable under the Loan Agreements.  DGC assigned Susquehanna the right to "all of DGC's accounts receivable" under the Security Agreement dated May 16, 2006.  Susquehanna perfected its security interest in the receivables of DGC on May 22, 2006 when it filed its UCC-1 financing statement with the Commonwealth.  The only other secured creditor is Great American, which is entitled to the receivables of DGC as collateral under its agreements of indemnity with DGC. Great American perfected its security interest in the receivables of DGC on March 28, 2008, some 22 months after Susquehanna.  Susquehanna's claim to the fund has priority over the claim of Great American.  See 13 Pa. Cons. Stat. § 9322 ("Conflicting perfected security interests . . . rank according to priority in time of filing or perfection."); see also Chrysler Credit Corp. v. B.J.M., Jr., Inc., 834 F. Supp. 813, 830 (E.D. Pa. 1993) ("generally, the party who filed his security interest first will have priority").

Having assigned its interests in its receivables to both Susquehanna and Great American, DGC has only a remainder interest in its own receivables subject to the outstanding claims of Susquehanna and Great American.  Patterson and Davis have a derivative right to DGC's

15

unsecured claim on any excess of the fund.

### B.    Unclean Hands

My inquiry into which defendant is entitled to the interpled fund does not end with my

determination that Susquehanna's interest in the fund is first in line according to priority in time

of perfection.  Because the other defendants assert that Susquehanna acted with unclean hands, I

must consider whether it is necessary to exercise the Court's equitable jurisdiction to alter

Susquehanna's priority.  Principles of equity may be used to supplement the provisions of the

UCC unless they are displaced by a particular provision.  See 13 Pa. C.S. § 1103 ("Unless

displaced by the particular provisions of this title, the principles of law and equity . . . supplement

its provisions."); Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc., 821 P.2d 788, 794-97 (Colo.

1991) (holding that the UCC "recognizes that equitable principles may require alteration of the

priority system in particular circumstances.")  Further, a party who acts in bad faith is not entitled

to the protections afforded by the UCC.  See 13 Pa. Cons. Stat. § 1203 ("Every contract or duty

within this title imposes an obligation of good faith in its performance or enforcement.").

The doctrine of unclean hands provides that those who come to a court of equity must do

so with clean hands.  Lee v. Lee, 978 A.2d 380, 387 (Pa. Super. Ct. 2009), quoting Shenango

Valley Osteopathic Hosp. v. Dep't of Health, 451 A.2d 434, 440 (Pa. 1982).  "Application of the

defense of unclean hands . . . rests in the discretion of the court . . . ."  Castle v. Cohen, 676 F.

Supp. 620, 628 (E.D. Pa. 1987).  "In the Third Circuit, a defendant asserting the 'unclean hands'

defense must introduce 'clear, convincing evidence of 'egregious' misconduct.'"  Merisant Co. v.

McNeil Nutritionals, LLC, 515 F. Supp. 2d 509, 531 (E.D. Pa. 2007), quoting Citizens Fin Grp.

Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 129 (3d Cir. 2004).  "'Egregious misconduct' can take

16

the form of 'fraud, unconscionability, or bad faith on the part of the plaintiff.'"  Merisant, 515 F.

Supp. 2d at 531, quoting S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 377 n.7 (3d Cir.

2004) (further citations omitted).  "To establish a defense of unclean hands, the defendant must

allege that the defendant was injured 'as a result of the misconduct.'"  Merisant, 515 F. Supp. 2d

at 531, quoting Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P., 292 F. Supp.

2d 594, 610 (D.N.J. 2003).

To establish that Susquehanna acted with unclean hands such that equity would bar its

claim to the interpled fund, the other defendants must show both that Susquehanna acted

fraudulently or with bad faith or that its actions were unconscionable and must also show that

they were injured by any misconduct by Susquehanna.  For the reasons set forth below, I find that

the other defendants have not set forth sufficient evidence to support a finding unclean hands on

the part of Susquehanna.

### 1.    Susquehanna's Efforts to Collect on DGC's Obligations to It

The other defendants argue that Susquehanna overstepped its authority under its

agreements with DGC by "tak[ing] over the business and management operations of" DGC and

by filing the AAA Arbitration proceeding on behalf of DGC," Post-Trial Br. of Morris, DGC,

Patterson & Davis at 8, and that the Security Agreement did "not allow [Susquehanna] to appoint

a consultant to manage and control DGC's business finances, fire or promote DGC's employees,

[or] determine which creditors of DGC will and will not be paid from the accounts

collected . . . ."  Post-Trial Br. of GA at 4.  I disagree.

Under the Security Agreement, in the event of a default by DGC, Susquehanna had the

right "acting if it so cho[se] in the [DG Obligors'] name, to collect Accounts itself, to sell assign

compromise, discharge or extend the time of payment of any Account, <u>and to do all acts and things necessary or incidental thereto</u> and the [DG Obligors t]hereby ratifie[d] all such acts."  SB Ex. 1 at 6 (emphasis added).  DGC explicitly allowed Susquehanna to "step into its shoes" to collect amounts due to DGC and to do anything necessary to collect on DGC's accounts, including bringing an arbitration claim against Domus in DGC's name.  The other defendants have not presented any evidence to show that the efforts undertaken by Susquehanna to collect on DGC's accounts fell outside of the broad rights DGC assigned to Susquehanna under the Security Agreement and the Forbearance agreement. "[T]he facts of the record simply do not support a finding of willful conduct rising to the level of fraud, unconscionability, or bad faith necessary to invoke the doctrine of unclean hands."  <u>Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.</u>, No. 91-6818, 1992 WL 13682, *12 (E.D. Pa. Jan. 27, 1992).

      **2.**    **Klehr Harrison's Alleged Conflict of Interest in its Representation of Both Susquehanna and DGC**

The other defendants also argue that Susquehanna has unclean hands in that its counsel, Klehr Harrison, represented DGC in the arbitration proceeding and has a conflict of interest in representing Susquehanna in this proceeding.  Rule 1.9(a) of the Pennsylvania Rules of Professional Conduct provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent."  Pa. Rules of Prof'l Conduct 1.9(a); <u>see also</u> <u>Henry v. Del. River Joint Toll Bridge Comm'n</u>, No. 00-6415, 2001 WL 1003224, at *2 (Aug. 24, 2001) ("An analysis of a potential violation of Rule 1.9(a) focuses on whether the prior and present matters are

substantially related, whether the clients have materially adverse interests, and whether the clients consent after consultation.").

Given the potential relevance of information obtained from DGC in the arbitration proceeding to Susquehanna's prosecution of its interests to the interpled fund in this action and the clearly adverse interests between Susquehanna and DGC, Klehr Harrison arguably should have obtained DGC's consent prior to undertaking to represent Susquehanna.  However, I find that DGC cannot use Klehr Harrison's apparent conflict of interest to obtain priority for its interests in the interpled fund over the interests of Susquehanna.  First, DGC did not seek to disqualify Klehr Harrison from its representation of Susquehanna.  "[W]hen a former client was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly when he had the opportunity . . . the person whose confidences and secrets are at risk of disclosure or misuse is held to have waived his right to protection from that risk." INA Underwriters Ins. Co. v. Nalibotsky, 594 F. Supp. 1199, 1204 (E.D. Pa.1984).  Second, the other defendants have put forth no evidence that DGC might have disclosed to Klehr Harrison confidences which could be detrimental to DGC in the present litigation.  See Agsaver LLC v. FMC Corp., No. 11-977, 2011 WL 2274178, at * 9 (E.D. Pa. June 9, 2011) (finding defendant did not meet burden of showing that former counsel's representation of adverse current client was impermissible under Rule 1.9 where defendant failed to explain how any knowledge counsel might have gained in its prior representation would be detrimental to defendant in the pending action).  Absent evidence that DGC was injured by Klehr Harrison's apparent conflict of interest, the other defendants have not met their burden to establish that Susquehanna had unclean hands. See Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3d Cir. 2001) (citation and

internal quotation omitted) (holding defense of unclean hands is available only "for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.").

### 3.     Susquehanna's Alleged Failure to Maintain DGC's Compliance with Minority Business Enterprise Certification Requirements

Finally, the other defendants argue that Susquehanna has unclean hands in that it caused DGC to fail to comply with the minority business enterprise certification requirements. I disagree. There is no evidence in the record that Susquehanna knowingly or intentionally failed to ensure that DGC remained in compliance with the minority business enterprise certification requirements. Cf. Neo Gen Screening, Inc. v. TeleChem Intern., Inc., 69 F. App'x 550, 556 (3d Cir. 2003) ("we cannot conclude that the District Court abused its discretion in rejecting the claim that an injunction was barred by [defendant's] 'unclean hands'" where plaintiff "cite[d] to no evidence which shows that [defendant's] omission was knowing or intentional"). At best, the other defendants have established merely that Susquehanna was negligent in failing to ensure that DCG remained in compliance with the minority business enterprise certification requirements.

Further, there is no evidence in the record to support a finding that any failure to maintain DGC's compliance with the minority business enterprise certification requirements caused harm to the other defendants. In its post-trial brief, Great American contends that,

> the public entities which funded the Robert Vaux Middle School
> Project might have withheld payments to Domus on the basis that
> DGC no longer held the required MBE status. . . . Great American,
> too, could have been harmed by DGC's loss of MBE status
> because Great American bonded Domus for the [Vaux project].
> Domus's failure to satisfy its contractual MBE requirements for
> that project could have been deemed an event of default under
> Domus' contract with that project's owner, which could have given

rise to performance bond claims against Great American.

Post-trial Br. of GA at 7 (emphasis added).  There is no evidence that any of these potential

harms actually occurred and the other defendants have not set forth sufficient evidence to support

a finding unclean hands on the part of Susquehanna.

Because the other defendants have not established an equitable reason to alter

Susquehanna's superior priority, I will award the interpled fund to Susquehanna.

## III.   Declaratory Judgment

Domus seeks a judgment declaring that, by its release of the amount determined by the

panel of AAA arbitrators to be the receivables due to DGC, Domus has discharged all liability

for monies owed to DGC and not just its liability for the amount due for the Vaux Project.

Susquehanna counters that the Court should enter judgment declaring that Domus has additional

liability to DGC on the Martin Luther King Plaza Project and the Schuylkill Falls Housing

Development Project and for interest on the arbitration award.

Pursuant to the Declaratory Judgment Act, a district court has the power to "declare the

rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. §

2201(a).  "Whether declaratory relief should be granted in an appropriate case is committed to

the sound discretion of the trial court."  Main Line Paving Co. v. Bd. of Educ., Sch. Dist. of

Phila., 725 F. Supp. 1349, 1357 (E.D. Pa. 1989).

The arbitrators found that "[t]he amount due [DGC] under its subcontract with Domus is

$738,045.00."  Domus Ex. 11; SB Ex. 15.  The arbitration award does not specifically identify

the relevant "subcontract."  Instead, it states that the arbitrators' finding is made pursuant to their

designation as arbitrators "in accordance with the arbitration agreement entered into between

[Domus and DGC] and dated December 18, 2006." Domus Ex. 11; SB Ex. 15.  The Vaux

subcontract, which includes an arbitration provision at Section 6.2, is dated December 18, 2006.

SB Ex. 16.  The Martin Luther King and Schuylkill Falls project subcontracts are dated July 7,

2005, and February 25, 2002, respectively, SB Exs. 17, 18., and neither the Martin Luther King

subcontract nor the Schuylkill Falls subcontract  are referenced in the arbitration award.  Domus

Ex. 11; SB Ex. 15.  Accordingly, I will enter judgment declaring that Domus is discharged from

further liability to defendants with regard to its obligations to DCG with respect to the Vaux

Project subcontract, but decline to exercise the Court's discretion to discharge Domus from any

liability it may have to DGC for the Martin Luther King project or the Schuylkill Falls project.

 With respect to Susquehanna's demand for interest on the arbitration award, I find that

Domus "bears no liability for interest on the interpleaded fund after the date that [it] pa[id] the

interpleaded fund into court."  Fidelity Bank v. Com. Marine and General Assur. Co., Ltd., 592

F. Supp. 513, 524 (E.D. Pa. 1984), citing Provident Indem. Life Ins. Co. v. Durbin, 541 F. Supp.

4, 9 n. 4 (E.D. Pa. 1981); see also Atlin v. Security-Connecticut Life Ins. Co., 788 F.2d 139, 142

(3d Cir. 1986) ("No interest runs against the stakeholder after he pays the disputed sum into

court.").  However, I find that Domus should be charged interest at the statutory rate of six

percent per annum, 41 Pa. Stat. Ann. § 202, from April 28, 2010, the due date set forth in the

arbitration award, to June 1, 2010, the date on which Domus deposited the amount due with the

Court, a period of 34 days.  See Atlin, 788 F.2d at 142 ("Between the time that the loss becomes

payable and its consignment to the court, however, the stakeholder has had the beneficial use of

the fund, and the rightful owner has not.  In the absence of a policy provision to the contrary, no

legal reason supports the denial of interest for that period."); Mass. Mut. Life Ins. Co. v. Central

<u>Penn Nat. Bank</u>, 372 F. Supp. 1027, 1035 (E.D. Pa. 1974) (finding interpleading party should be charged interest on money withheld "prior to the payment thereof into the registry of the court" because it "had the use and benefit of the sums of money withheld").  Accordingly, Susquehanna is entitled to an award of interest from Domus in the amount of $4,296.24.[8]

An appropriate Order follows.

---

[8]     The interest amount is derived as follows:

6% per year x $768,674.00 = $46,120.44 per year

$17,061.23 per year / 365 days = $126.36 per day

$126.36 per day x 34 days = $4,296.24